Good morning, your honors. May it please the court, Craig Houghton, counsel for the appellants Dana Messina, Nancy Messina, Kyle Kirkland, and Stephanie Lane. One thing I will do is this is a tax case and I've been a tax lawyer for 40 years. I will try to speak in English, not in tax, so that we can all communicate today in the oral argument. I'd like to start with restating the issues that are stated at the opening of the brief because I think it's relevant. First question is whether a taxpayer, like the commissioner, can apply the substance of reform doctrine to determine the proper tax treatment of a transaction. I think based on the precedent in both the Supreme Court, this circuit, and other circuits, as well as in the tax court where this case originated, the answer to that is yes. Assuming that's the case, the next question for this court, which is actually I think an easy question as well, is whether the substance of Kirkland and Messina, the taxpayers here, purchase our loan of $14,475,000 to KMGI, an affiliated corporation to Club One Acquisition Corp., the lost corporation in this case, created indebtedness of Club One Acquisition to Kirkland and Messina for purposes of Section 1366d1 of the Internal Revenue Code. I think the answer to that, based on the test established by the commissioner, applied by the courts, and also based on other judicial doctrines that are relevant in this case, the answer to that question is yes as well. Now, sort of a summary of the appellant's position, I think, will point to the salient issues in this case. First, unlike many of the cases in this area, the purchase of the Zwerin loan, the loan that was used to originally acquire Club One Casino, was not done for tax planning or tax avoidance purposes. Rather, the purchase of the note was because it had matured by its terms and was due. Number two, if Kirkland and Messina had purchased the loan directly, we would have had no issue because under the government's theory of direct debt. That's right. That's not my question, is why didn't they just do that? Well, because in order to purchase this, Club One Casino is a card room that is regulated by the California Gambling Control Commission. Commission approval is required, and interestingly, I'm not an expert in gambling in California, but what I can tell you is even though Kirkland and Messina were approved to own stock in Club One, they were not approved to purchase the debt. They had to have a separate approval in order to do so. And what the record shows is when they applied to get that approval, subsequent to the years in issue, it took almost a year to get that approval. Now, what happened in this case, factually, is Kirkland and Messina, starting in late 2010, the note again may have matured in February of 2012, were looking for someone else to provide the money to buy the Zora Note. They bought this in a leveraged transaction, putting less than a million dollars into a $27 million acquisition. The note, which was originally in excess of $21 million, was now in the $15, $15.5 range at that point in time, and like a lot of people in their business world, they used debt financing to acquire the company, and they wanted someone else to take that place in lieu of them, number one. Number two, at the time, they did not have the personal liquidity to do it. That came later, much later, on something that, contrary to what was stated by the commissioner in their briefs, was totally unrelated to this transaction. So what happened is they formed KMGI, which I call a shell company. Judge Laura may disagree with me, but it was a shell. It had no assets. It had nothing at that point in time, to use that as a vehicle for someone else to provide the money to buy the debt. And had they done that, we wouldn't be here either. But that didn't occur, and they hired investment bankers to look for them. They spent a significant amount of effort and time, as the record clearly reflects, to try and find that third-party investor or purchaser or lender to take the place of the current holder of this warren loan. Unfortunately, they were unsuccessful. Now, what did happen months later, in July of 2011, Kirkland and Messina had owned another company called Steinway Pianos, and someone made an offer to purchase that, and at that moment in time, they had a sale, they had some liquidity, and they had the possibility of doing that. But again, the unrefuted facts in the case, it was a fully stipulated record at the tax court, said they were looking for other people's money still. They weren't going to commit theirs. But what they did do, because they were knowledgeable, they said, let's get KMGI approved to buy a part of the loan, get our foot in the door, which is what they did. So they applied for approval. Again, I'm not an expert, it's not in the record. My understanding is, because KMGI had nothing and no history, it was much easier for them to get approved, as it might be for me or someone else, who they would run all my financial transactions for years and everything else and do extensive investigations. So that approval occurred. You're speaking of the gambling commission. Correct. So what happened, again, the gambling commission versus the commissioner. I apologize for the similarity, but again, thank you for, I'm happy to clarify. So what happened at that point in time. Wasn't there a concern about loan priority as well? There wasn't, Your Honor, because that is a misnomer in this case. The Zwirin loan was subordinated to two notes, two and a half million apiece, held by the original sellers of the stock to Club One Acquisition Corp. Those loans were pursuant to a subordination agreement. Anyone who bought the Zwirin loan would be the beneficiary of that subordination agreement. Anyone who put in new money into the transaction would not have the benefit of that subordination agreement. So it was important for someone to buy the note. Was it important to use KMGI to do that as claimed by the appellee? No. Anyone could have done that. I could have done that and had the same benefit of the subordination agreement. So that's just factually incorrect. So what happened is they approached Zwirin. It's clearly in the record. And talked to Zwirin and said, okay, can we buy a piece? Zwirin said, we're not selling piece, no. Pay us off. They said, well, we've been looking in the market. We're working to find that. We haven't been successful. And the people from Zwirin said, it's 2011. The markets are terrible. We don't think you will find that. And they talked about a brief extension of the note on terms that were not commercially reasonable. So the net effect is in November of 2011, and the dates are important, Kirkland and Messina said, we don't have a shot. We are going to have to reach in our pockets, pull out $14.5, almost $14.5 million that we pay tax on. It's our money. And we're going to have to put this into the deal. Now, they still were working with a potential investor buyer through Global Hunter. It's also clearly stated in the record. And what happened is there was a proposal, but the two selling shareholders had, there was litigation with them. They weren't going to cooperate. And so that potential option evaporated again at the end of 2011. What also happened is steps were taken by those shareholders to create an event of default under the loan in January of 2012, roughly a month and a half before the note matured per its terms. So with the gun at their head, with the situation where it was, they went to the gaming commission and said, will you allow KMGI not to buy $200 of the note, but all of the note? So it was just an increase. Now, it's very interesting. The staff report, which is in the record, where the gaming commission said, you think about it, you have a shell company that in September, in order to buy the $200, Kirkland and Messina put $10,000 apiece and loaned another $100 apiece. So it had a total of $20,000 in equity and $200,000 in debt, all from Kirkland and Messina. No business, nothing else. Just that, to buy the $200. If you were Fortress and you held a note that was almost $14.5 million and someone with $20,000 in equity and $200,000 in debt said, I'd like to buy it, I would say, I'm not wasting my time. The gambling control commission was approached to say, we want you to approve KMGI to do this, and as the staff report clearly shows, Kirkland and Messina put in their financial statements and commitments to provide 100% of the funds to do that so they could get gambling commission approval, which occurred. Now, meanwhile, in that time frame while they were seeking that approval, which took a couple of months, the note matured. Fortress hired Skadden Arps to foreclose and pursue their rights if they couldn't do it, but fortunately Fortress knew the efforts that were being undertaken. They knew that there were problems and actually the former shareholders objected at the commission proceeding, which is in their record, and were going to be obstructionists, but they got it approved. So then what happened? One and two days before the closing, Kirkland and Messina wired $14.7 million of their money into KMGI. On the third day, that money was used, $14.475 in change, to buy the paper from Fortress. KMGI became the holder, and on the fourth day, all but $945 was returned to Kirkland and Messina. Now, when you look at this, and what's also in the record, one of the other shareholders testified in a deposition involving the battle over with the shareholders, who bought the note? Kirkland and Messina. The Gaming Commission knew it was Kirkland and Messina's money. Fortress knew it was Kirkland and Messina's money. The one hostile shareholder knew it was Kirkland and Messina's money. Everyone knew it was Kirkland and Messina's money. So that's what happened, and as payments were made, they went right through KMGI the same day or within a day or two and pushed out to Kirkland and Messina. Now, what's interesting in this case is that because they provided all of the funds, they were able to get the what they did when they prepared their tax returns. Again, this isn't a year-end move to try and take a loss. What this was was they sat down with their advisors and said, how do we report this? And they said, well, it's easy. The commissioner and the courts in 2012 had a test. It said, who made the true economic outlay, and who was poor in a material sense? The facts here, this is not technical tax. This is common sense. The people who put in the $14.475 and change to buy the note made a true economic outlay. They were clearly poor in a material sense. They took all the risk. There was no risk on KMGI, and if you look at its balance sheet, think about it. They loaned the money to KMGI. It had a debt. It used the money to buy this Warren loan. It had an asset, and the impact on its balance sheet was zero because what it acquired was fully offset by what it owed. So it had no outlay at all from a financial statement, and the proper time to test is when the transaction was done. And so what you have in this case is a situation where I think it's very clear that the standard that is applied by the commissioner that is approved by the courts in 2012 is that you look at a substance test. Who made the true economic outlay? That's not form. If the test was form, then the cases where the taxpayer lost because it was year-end circulation of funds or it was a year-end maneuvering to try and get basis in a debt where the money came from an affiliate, that would not be available here, but that's not what happened. More importantly, one of the questions is the concern if this court allows a taxpayer to search substance over form, which it has based on my count on seven other occasions, consisting with five occasions when the U.S. Supreme Court has done that, and numerous occasions where other courts have allowed that. It's a simple rule. A taxpayer has the right to assert priority of the substance of a transaction over its form where the taxpayer's position is consistent with the position taken by the commissioner and followed by the courts in other cases following similar or the same transaction and the taxpayer's tax reporting and other actions are consistent with that. And they are. There's a statement here that the taxpayer tried to take the basis twice. That is factually not correct. The record was clear. They took it as debt basis in Club One acquisition. They did not take it in KMGI. And you can try to muddle that, but it's incorrect. I have 52 seconds left. I will reserve that for rebuttal. Thank you. May it please the court. Jacob Christensen for the commissioner. The issue in this case is whether the taxpayers, Mr. Kirtland and Mr. Messina, can invoke the substance over form doctrine in order to avoid the plain terms of the statute in question, section 1366 of the Internal Revenue Code. The district, the tax court correctly held, rejected that by the form of the transactions that they choose and are not able to later claim that the substance of the transactions was something different in order to gain a tax advantage. Second, even if they could, the transactions in this case, their substance matched the form of the transaction. Under section 1366, the amount of the loss or a deduction that the shareholder of an S-corporation can claim from the S-corporation is limited to the shareholder's basis in the stock and any indebtedness of the S-corporation to the shareholder. So the courts of appeals have interpreted the language of that statute to mean that the debt must run directly from the S-corporation to the shareholder. In the case of Burroughs that we've cited, a Sixth Circuit decision in 2013, the court stated an S-corporation's indebtedness to another entity, even one wholly owned by the shareholder, does not increase the amount of pass-through deductions the shareholder can claim. In this case, there's no dispute that the debt, the indebtedness in question ran from casino to KMGI, which was a corporation created by the S-corporation. In other words, the indebtedness did not run directly from the S-corporation to the shareholders who are the taxpayers in this case. So in order to get around that, the taxpayers have invoked the doctrine of substance over form. We think that the Supreme Court was quite clear in the case of National Alpha Alpha when it stated that this court has observed repeatedly that while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not. This court, we submit, has adhered to that rule. This court followed National Alpha Alpha and paraphrased it in the Wilkins decision that we've cited on page 22 and 22 of our brief. This court has even gone so far as to give the policy reasons for that rule, stating in the Miletus case that we've cited that the commissioner should have the sole power to sustain or disregard the transactions form or otherwise the opportunities for manipulation of taxes would be practically unchecked. In the case of Steen, which is a 1975 case from this circuit, the court also explained some of the other policy reasons. Allowing taxpayers to challenge the form of the transaction that they have chosen themselves would encourage post-transactional tax planning, unwarranted litigation on the part of many taxpayers. It would raise a monumental administrative burden and substantial problems of proof on the part of the government. So this court has followed the Supreme Court's instruction in the National Alpha Alpha case. My opposing counsel has cited cases from the Ninth Circuit that he claims stand for the proposition that this court has made exceptions. We disagree with that characterization of each of the cases that have been cited. Most of the, well, several of the cases that have been cited involved what I refer to as a mere mislabeling. For example, in a contract, an individual was referred to as an employee rather than an independent contractor. Or another example is a contract may have been titled as a lease and option to sell rather than an outright sale. And so those circumstances involve a mislabeling, which is qualitatively different from a court actually disregarding the form of a transaction, which goes much further. Counsel, your opposing counsel filed a 28-J letter referring us to a 2019 tax court case that gives four circumstances under which we could look at the substance over the form. Are you familiar with the case? Yes, I am familiar with that. And I would say, Your Honor, that to the extent the tax court has recognized an exception or that other courts of appeals have recognized exceptions in extraordinary circumstances, we would submit that that is inconsistent with the Supreme Court's instructions in the Supreme Court cases we've cited and also with the way that we read this Court's prior precedents. Many of the other — some of the other cases that my opponent has cited also well — are really old cases, actually. And predate the Supreme Court's instructions, more recent instructions in National Alpha Alpha, for example. So I will say that, you know, as to my second point, you know, whether or not the taxpayer can ever invoke the doctrine of substance over form, this case certainly does not present the exceptional circumstances that would be required for that to happen. And the — first of all, the taxpayers argue that KMGI, which they created to actually purchase and acquire the loan, should be ignored or disregarded for tax purposes, or that its purchase of the loan should be disregarded. That — those arguments lack merit, first of all, with respect to the KMGI corporation. You know, in Maleen Properties, the Supreme Court held that S-corporations and corporations are separate legal entities and must be respected for tax purposes. The one exception could be as if the corporation acts as an agent of the shareholders. And in this case, taxpayers have conceded that — well, they have not raised, renewed their argument on appeal that Messina and Kirkland were agents of KMGI. The tax court below found that they were not agents, and in their reply brief, they've conceded that they have not renewed that argument on appeal. So KMGI, being a separate entity, must be respected for tax purposes. They also argue that the purchase of the loan by KMGI instead of them by themselves directly should be disregarded, and the reason that argument fails is that they had, as my friend has explained this morning, they had several, many business reasons for using KMGI to purchase the loan instead of doing it directly. The taxpayers could have purchased the loan directly. There was no law forbidding them from doing that. The gambling commission eventually approved them in 2015 to acquire the loan. You agree they had a non-tax business purpose to use the corporation? Yes, most certainly. And I think the bottom of that was that they wanted to avoid the risk that if Kirkland were to have to seek approval from the gambling commission and then first seek that approval and then purchase a loan, that would have taken too much time. Time was of the essence because the loan was already in default. There was a risk that Fortress could seize the collateral that secured the loan, which was the assets of Casino and also all the stock of Casino. And Kirkland and Messina were also obligated under their own personal guarantees under that loan. So if it was in default, they could be liable to have to pay to Fortress. And so I think those facts show the reason why time was of the essence and why they wanted to create KMGI to purchase the loan, because KMGI had already been approved to purchase a portion of the loan. And so all they needed to do was to seek further approval for KMGI to acquire the entire loan. And so it was really to avoid delay. And that's because there was a valid non-tax business reason for forming KMGI and for using KMGI to purchase the loan. It simply cannot be disregarded under any doctrine of substance over form. Taxpayers argued that they used KMGI to purchase the loan because they had to do so to comply with state law, and that in considering the doctrine of substance over form, the court shouldn't give weight to requirements of state law and can ignore those as not being valid business reasons. To the contrary, however, when transactions are carried out for the purpose of complying with state law, that is a valid business reason that gives substance to the transaction. And the support for that is actually the Supreme Court statement in Frank Lyon, which was a substance over form case. It's also been cited for the economic substance doctrine. But in Frank Lyon, the Supreme Court stated that when there is a genuine multi-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations and is not shaped solely by tax avoidance features, then the form of the transaction is respected. I would say here that, again, the taxpayers had valid business reasons for the transaction so that the taxpayers, shareholders, you know, themselves purchased the loan. They chose not to do that. The only purpose for which they asked the court to disregard KMGI is for tax purposes. For every other reason, they have treated KMGI as a separate corporate entity and the tax court actually found that they always intended for KMGI to be treated as a separate corporate entity. I had a cite for that, but that's in the tax court's findings that they always intended to treat KMGI as a separate corporate entity. Your Honor asked about loan seniority and whether that was a reason for creating KMGI. The answer from the opposing counsel was no, that that was not a reason. What I would say is that whatever transaction they carried out in their tax planning, they wanted it to provide, to retain the seniority of the loan. And if the taxpayers had simply loaned money to the casino for it to pay off the loan itself, they would have lost that seniority. Right, but I think his point was that they could have individually purchased the loan and kept the subordination. Right, and I think that's correct, and we would agree with that. There were reasons why they did not do that, as we've touched on. My opponent suggested that everyone involved in the transactions knew that it was really Mr. Kirkland and Messina that were purchasing the loan and not KMGI. The tax court actually made a finding that KMGI did not hold itself out as an agent of the taxpayers. So the tax court's findings contradict the assertion that's been made this morning, that everybody knew that it was really Kirkland and Messina that were purchasing the loan. That is not what the tax court found, and the tax court found the opposite. The last thing I would say is with respect to the economic outlay doctrine. That is a doctrine that has been applied in cases, for example, that may involve a back-to-back loan, where a shareholder receives a loan from a third entity and then makes a payment, then turns around and loans the proceeds to the S Corporation. In those cases where this doctrine has been applied, there is always still an indebtedness that runs directly from the S Corporation to the shareholder. And in applying this doctrine, the courts have imposed an additional requirement that the shareholders actually have an actual economic outlay. And so that is an additional, it's a requirement in addition to the requirement under the statute that the debt and indebtedness run directly to the shareholder. In this case, the government does not dispute that Messina and Kirkland made an economic outlay in providing funds to KMGI, but then KMGI did the same in purchasing the loan. I see that my time is up, Your Honor, so I would ask, again, for these reasons that the decision below be affirmed. Thank you, Counsel. Thank you, Your Honors. I have many points to hit in a very short time, so I will quickly. First of all, as to the comment about National Alfalfa. National Alfalfa is a 1974 case. In Clark, the U.S. Supreme Court allowed a taxpayer to assert substance over form. That's a 1989 case, years after National Alfalfa. More importantly, this Court cited it with approval in Brown in 2003, number one. Number two, as the judges noted, very recently, less than a month ago, the tax court and ag processors said, you can assert substance over form, so it's allowed. The last point I would like to make in this case is, one of the key factors that has been misconstrued is the release of the guarantee. When KMGI bought the paper because Kirkland and Messina put up the note, they released the guarantee because why should they guarantee themselves? It speaks bundles about what was really going on here. This is a substance test. This is a substance case, and I would like to make a point here, and follow clear precedent in the Supreme Court and others. The other final, real quickly, final point, Judge Laro acknowledged that the step transaction is a two-way street and misapplied the rule. This Court's decision in Brown shows that he was wrong on the law. It's a clear error of law, and if you want a simple way to rule for the taxpayers, you can look at our argument on that in the reply. Thank you so much for your time. I truly appreciate it, and I look forward to your decision.
judges: Thomas, Tashima, Wardlaw